## CIRCUIT COURT OF THE CITY OF RICHMOND

Maurica Slade,
Administrator
of the Estate of
Phillip L. Slade,
deceased

    v.

Michael T. Collawn et al.

January 6, 1997

Case No. LB-245-4

BY JUDGE RANDALL G. JOHNSON

This is a declaratory judgment action to determine insurance coverage. It is before the court on plaintiff's motion for summary judgment against one of three insurer-defendants and that insurer-defendant's motion for summary judgment against plaintiff. At issue is whether plaintiff's decedent was "occupying" or "using" an automobile at the time of his fatal injury so as to invoke the underinsured coverage of an insurance policy.

The relevant facts are stipulated or otherwise not in dispute. Plaintiff's decedent, Phillip L. Slade, was employed by Capitol Lincoln-Mercury as a car salesman. On June 3, 1995, with his employer's permission, Slade drove a 1988 Nissan Maxima automobile to his home to show his wife and to see if she was interested in buying it. His wife did not want to buy it. On June 4, 1995, again with his employer's permission, Slade was driving the car back to Capitol to return it and to go to work. While driving on Interstate 64, Slade saw what appeared to be a stranded automobile on the shoulder of the road. He parked the Maxima on the shoulder approximately eighteen feet behind the stranded vehicle, got out of it, and walked to the stranded vehicle. The stranded vehicle's driver told Slade she was having car trouble. Slade told the other driver he would get a flashlight from the Maxima and come back to take a look at her car. As Slade was walking on the shoulder of the road back to the

Maxima, he was struck by a vehicle driven by defendant Michael Collawn. Slade died at the scene. The Maxima was not struck by Collawn's car, and Slade was not in physical contact with any part of the Maxima when he was struck.

Collawn is insured by a policy with defendant Nationwide Mutual Insurance Company with a $50,000 liability limit. Slade's wife is the named insured under a policy with defendant GEICO General Insurance Company with uninsured/underinsured motorist coverage limits of $300,000. Defendant Motors Insurance Corporation (MIC) insures Capitol Lincoln-Mercury under a policy with uninsured/underinsured motorist coverage limits of $1,000,000. Nationwide, Collawn's insurer, has tendered to plaintiff its limit of $50,000. GEICO, Slade's wife's insurer, denies coverage on the basis of what it contends was incorrect and misleading information furnished by Ms. Slade in her application for insurance, an issue not presently before the court for decision. What is before the court for decision is whether coverage is provided by the policy issued by MIC. The court holds that it is not.

The uninsured/underinsured endorsement to the MIC policy defines "insured" as:

> Anyone … "occupying" a "covered auto" or a temporary substitute for a "covered auto."

It is agreed by the parties that the Maxima driven by Slade on June 3 and 4, 1995, was a "covered auto." The endorsement also provides:

> "Occupying" means in, upon, getting in, on, out, or off.

Under that definition, Slade is not covered. In the recent case of *Stern v. Cincinnati Ins. Co.*, 252 Va. 307, 477 S.E.2d 517 (1996), the Supreme Court of Virginia considered identical language in holding that ten-year-old Elena Stern was not "occupying" a school bus when she was struck by a car as she was walking to, but was still "several feet" away from, the bus. The court said:

> When the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written … . We think the language in the Graphic Arts policy is clear and unambiguous.
>
> The policy defines "occupying" as "in, upon, getting in, on, out, or off." The Sterns concede that Elena was not "in" or "upon" the school bus and that she was not "getting out or off" the bus. They contend,

however, that Elena was "getting in [or] getting on" the bus. We do not agree.

The terms "getting in" and "getting on" a vehicle must be read and interpreted in relation to "occupying," the word defined in the policy ... . The word "occupying" denotes a physical presence in or on a place or object. Thus, when the terms "getting in" and "getting on" are read in relation to "occupying" a school bus, and when the terms are given their plain and ordinary meanings, they require a close proximity to the bus.

We do not think that Elena, who was near the center line of the road when she was struck, was in such close proximity to the school bus. She was merely approaching the bus, and we cannot say that she was getting in or on the bus, as contemplated in the Graphic Arts policy. Therefore, we answer the first certified question in the negative.

252 Va. at 310-11 (citations omitted). *Stern* was before the Court on questions of law certified by the United States Court of Appeals for the Fourth Circuit. The question being answered by the above language was "Was [Elena] 'occupying' the school bus, as that term is defined in the Graphic Arts policy, when she was injured?" The Graphic Arts policy was the policy applicable to the school bus.

Here, too, Slade was not "in" or "upon" the Maxima when he was struck. Nor was he "getting out or off" of it. Similar to plaintiffs' contention in *Stern*, plaintiff here contends that Slade was "getting in" the Maxima — to get a flashlight — when he was struck. The stipulated facts, however, say otherwise. Specifically, while we do not know the precise spot on the shoulder of the road where Slade was struck, we do know that it was somewhere between the stranded car and the Maxima. We also know that the Maxima was approximately eighteen feet behind the stranded car and that Slade had not reached the Maxima when he was struck. As such, Slade's proximity to the Maxima cannot be said to be any different than the "several feet" Elena Stern was away from the school bus in *Stern* (*see* 252 Va. at 309), a distance which the Court said was not such close proximity to the bus as to constitute "getting in or on." This court cannot arrive at a different holding here. This does not, however, end the inquiry.

For purposes of the uninsured/underinsured motorist coverage at issue here, Va. Code § 38.2-2206(B) defines "insured" as:

> [A]ny person who *uses the motor vehicle* to which the policy applies,
> with the expressed or implied consent of the named insured ... .

Emphasis added.

As plaintiff correctly points out, it is well-settled in Virginia that if the terms of an insurance policy are inconsistent with statutory provisions, and unless the policy terms provide broader coverage than the statute, the statutory provisions apply. *Hill v. State Farm Mutual Auto. Ins.*, 237 Va. 148, 151, 375 S.E.2d 727 (1989); *USAA Ins. Co. v. Yaconiello*, 226 Va. 423, 425-26, 309 S.E.2d 324 (1983). Thus, if Slade was "using" the Maxima when he was struck, within the meaning of the term "using" in § 38.2-2206(B), then MIC must provide coverage. Again, however, the court must hold that no coverage exists.

The Supreme Court has had several occasions to consider whether a person was "using" a motor vehicle in the context of uninsured/underinsured motorist coverage. In *Insurance Co. v. Perry, Adm'r*, 204 Va. 833, 134 S.E.2d 418 (1964), plaintiff's decedent was on duty as a police officer in Norfolk. Accompanied by a fellow police officer, he drove a city-owned police cruiser to the Virginia Beach Boulevard area of the city to serve a warrant. He parked the cruiser, placed its keys in his pocket and, with the other officer, walked along the roadway to a point 164 feet away from the police cruiser. He was there struck and killed by an automobile. Relying on the fact that the decedent "met his death when he was on foot, 164 feet away from the parked cruiser, engaged in the act of serving a warrant," the Court held that as a matter of law, his fatal injury did not occur while he was "using" the police cruiser. Accordingly, he was not an insured under the subject policy. 204 Va. at 838.

In *Great American Ins. Co. v. Cassell*, 239 Va. 421, 389 S.E.2d 476 (1990), decedent was a Roanoke City Fire Department captain. He and several other fire fighters responded to an emergency call. They went to the scene of the emergency, a fire in a car, on a fire pumper truck. They parked the truck approximately twenty to twenty-five feet from the disabled car, which was straddling the center line of the roadway. After the fire was extinguished, decedent was standing in the roadway completing his report when he, another fire fighter, and the owner of the disabled car were all struck and killed by a hit-and-run driver. The Court held that decedent was "using" the pumper truck when he was struck:

> We agree with the trial court's finding that Cassell was an insured for purposes of the mandatory uninsured motorist coverage provided in Code § 38.1-381(c). Cassell was using the fire truck when he was struck and killed by the hit-and-run driver. The fire fighters parked the

fire pumper and fire tanker on opposite sides of the disabled car, thereby creating a barrier to control traffic and protect the fire fighters. Cassell's fire truck was used to pump water (which was stored on the truck) through hoses to extinguish the fire. The clipboard and pad that were used to complete the required fire report were transported to the scene in the fire truck and were to be returned to the fire truck. Cassell was only 20 to 25 feet away from the fire truck when he was struck. Items which were taken from Cassell's truck to extinguish the fire were being returned to the truck when the accident occurred. Use of the fire truck to extinguish the fire, control traffic and protect the fire fighters, including Cassell, was an integral part of the fire fighters' mission. The mission had not been completed when the accident occurred. Unlike the police officer in *Perry*, Cassell was engaged in a transaction essential to the use of the fire truck when he was killed.

239 Va. at 424. The relevant provisions of former Va. Code § 38.1-381(c) are now in § 38.2-2206(B).

In *United States Fire Ins. Co. v. Parker*, 250 Va. 374, 463 S.E.2d 464 (1995), plaintiff, Nora Parker, was a landscape gardener employed by Ford's Colony, a residential development in Williamsburg. She and two co-workers were to plant cabbages at the entrance to the development, the specific site for the planting being adjacent to a public roadway. They went to the site in their employer's pickup truck. Plaintiff drove. They took with them the cabbages to be planted, a rake, a trowel, and the shovels they needed to perform their work. A two-way radio was installed in the truck, and they were required to leave the radio on at all times to enable them to receive messages from their supervisor. At the site, the trio worked as a team performing specific tasks as directed by Parker. She was to dig holes for the cabbages, another worker unloaded the cabbages, and the third worker planted them. Although not directed to do so by their supervisor, they parked the truck at the site in such a position as to provide a safety barrier to protect them from speeding motorists. They left a door of the truck open while planting the cabbages so they could hear the radio. While so engaged in their work, a speeding vehicle left the paved portion of the road, struck the truck, and then struck plaintiff as she was digging a hole in a flower bed twelve to fifteen feet from the truck. The workers had not completed their task, some plants remained in the truck, and they needed to clean up the area. The Court held that Parker was not covered:

Unlike the deceased in *Cassell*, the claimant in the present case was not engaged in a transaction essential to the use of the pickup truck when she was injured. In other words, she was not utilizing the

truck as a vehicle at that time. She was 12 to 15 feet away from the truck with her foot on a shovel in the act of digging a hole when struck.

The facts that the workers, independently and not because of any requirement by Ford's Colony, positioned the truck (which had no special, emergency warning lights) as a barrier, and that the radio was operating at the time (it could not be heard unless the workers were "in close proximity" to it), does not bring this case within the *Cassell* precedent. In *Cassell*, the fire truck's lights were burning, a hose connected to the truck used water carried on the truck to extinguish the fire, and emergency vehicles suitable for use to control traffic were utilized as barriers at the scene. Here, the truck merely was used as a means of transportation so that Parker could complete her landscaping duties.

Consequently, we hold that the court below erred. The trial court's order will be reversed and final judgment will be entered here in favor of the insurer declaring that it does not owe underinsured motorist coverage to Parker under the statutorily mandated provisions of its insurance contract.

250 Va. at 378.

The most recent pronouncement from the Court on this subject is the *Stern* case, discussed above with regard to the issue of "occupying." The second question certified to the Court by the federal appeals court was "Was [Elena Stern] 'using' the school bus, as that term is defined in Va. Code Ann. § 38.2-2206, when she was injured?" Again, the Court said no.

We think the Sterns' reliance upon *Cassell* is misplaced. In *Cassell*, the fire fighter began to use the fire truck by riding in or on it to the scene of the fire. At the scene, the fire fighter continued to use the truck and its equipment to extinguish the fire and to control traffic. Clearly, he was using the truck when the accident occurred.

In the present case, on the other hand, Elena had made no such use of the school bus. She had not been a passenger in the bus, and, although the school bus was utilized by its driver to create a safety zone for Elena to cross the street, the safety measures did not constitute a use of the bus *by Elena*.

We think the present case is controlled by our holdings in *Perry* and [*Parker*].

In *Perry*, we concluded that a police officer, who was engaged in serving a warrant, was not using his police cruiser at the time of the

accident because, when he was struck by an uninsured motorist, he had exited the vehicle, placed its keys in his pocket, and walked 164 feet from it ... . In *Parker*, we held that a landscape worker, who had driven the insured pickup truck to the area where the accident occurred, was not using the vehicle at the time of the accident because, when she was struck by an uninsured motorist, she was standing 12 to 15 feet from the vehicle and performing landscaping duties. She was not "utilizing the truck as a vehicle" when struck ....

In the present case, under the narrow coverage afforded insureds of the second class, Elena clearly was not utilizing the bus as a vehicle because she was not yet a passenger of the school bus and, therefore, was not using the bus, within the meaning of Code § 38.2-2206, when she was injured. Consequently, we hold that the Graphic Arts policy does not provide underinsurance coverage to the Sterns, and we answer the second certified question in the negative.

252 Va. at 312-13 (citations omitted, emphasis in original). The Court's reference to "insureds of the second class" is to persons such as Perry, Cassell, Parker, Elena Stern, and Slade who are not named insureds or relatives of named insureds residing in the same household. The distinction is important since under Va. Code § 38.2-2206(B), named insureds and their relatives residing in the same household are covered by uninsured/underinsured motorist coverage even while pedestrians. They are referred to in *Stern* and other cases as "insureds of the first class."

In attempting to apply the holdings of the four cases just discussed to the facts of the case at bar, it is clear that the present case does not fit neatly within any of them. While some of the facts of the present case are similar to some of the facts of each of those cases, other facts are different. Thus, while Slade, like Perry, Cassell, and Parker, arrived at or near the scene of his accident in the vehicle on which coverage is sought, Elena Stern did not. Slade, like Cassell, Parker, and Stern, was within twenty-five feet of the subject vehicle when struck. Perry was 164 feet away from his. While it can be said that Slade was on a "mission" to help a stranded motorist from the time he saw her until he was struck, just as Perry was on a mission to serve warrants, Cassell was on a mission to extinguish a fire, and Parker was on a mission to plant cabbages, Elena Stern's only "mission" was to attend school. A "tool" to be used in Slade's "mission," the flashlight, was in his vehicle when he was struck, just as Cassell's fire-fighting equipment was on the pumper truck and Parker's cabbages were on the pickup truck. No "tools" for a present "mission" were in Perry's police cruiser or on Elena Stern's school bus. Slade, like Stern, was

walking toward the subject vehicle when struck. Perry, Parker, and Cassell were not. Unlike the decedent or plaintiff in any of the Supreme Court cases, Slade was not only walking toward the subject vehicle when struck, he had arrived in it. Still, simply considering and comparing individual facts is of little help. Only by considering all of the facts in all of the cases can a proper decision be made.

In looking at the four Supreme Court cases, two things are obvious. First, *Cassell* presents the strongest fact pattern for holding that uninsured/under-insured coverage exists. Indeed, it is the only one of the cases in which the Court so held. Second, *Perry* presents the weakest. The only connection between Perry and the police cruiser at the time he was struck was that he arrived near the scene of his accident in it. He was much farther away from his subject vehicle than any of the others, including Slade, were from theirs. He was not walking toward it when struck, as were Stern and Slade, and he had no "tools" for his "mission" on it. In sum, his connection with the cruiser was not much different than the connection any driver or passenger has with a vehicle after parking and/or leaving it. As such, *Perry's* holding is not as significant to the case at bar as are the others.

With regard to *Stern*, Elena Stern's case is clearly stronger than was Perry's. She was only several feet from the school bus, and she was on her way to it, when struck. Her case is not, however, as strong as Slade's. Slade was also only a few feet from his subject vehicle and was also walking to it when he was struck. But Slade can be said to have been on a "mission;" there was a "tool" of that mission, the flashlight, in the vehicle when he was struck; and he had arrived at the scene in the vehicle. These latter three facts were not present in *Stern*. This leaves *Parker*, and it is *Parker* which this court feels requires the holding that coverage does not exist.

Slade drove to the scene of his accident in the Maxima, the vehicle on which coverage is sought. Parker drove to the scene of her accident in a pickup truck, the vehicle on which coverage was sought. Slade was on a "mission" to help a stranded motorist. Parker was on a "mission" to plant cabbages. A "tool" of Slade's mission, the flashlight, was in his vehicle when he was struck. "Tools" of Parker's mission, cabbages, were on the pickup truck when she was struck. Slade was less than eighteen feet from the Maxima when he was struck. Parker was twelve to fifteen feet from the pickup truck when she was struck. None of these facts are distinguishable. Other facts, however, are.

Slade was walking toward the Maxima when he was struck. Parker was not walking to the pickup truck. Perhaps most significant from plaintiff's perspective, though, is that Slade was going to the Maxima specifically to get something out of it — that is, to "further the mission" — when he was struck.

Parker, in the words of the Supreme Court, "was 12 to 15 feet away from the truck with her foot on a shovel in the act of digging a hole when struck." 250 Va. at 378. While these facts are significant, they are not determinative. If so, Elena Stern, who was walking to the school bus for the obvious purpose of getting on it, would also have been covered. She was not. As noted earlier, focusing on just one or two facts is not sufficient. It is the court's opinion that other factors "in favor" of Parker, not present here, balance or even outweigh the "extra" facts present in Slade's case.

In *Parker*, the plaintiff and her co-workers were required to leave the truck's two-way radio on while they worked so they could receive messages from their supervisor, and they had left the door to the truck open specifically so they could hear the radio. 250 Va. at 376. In addition, they parked the truck at the site "in such a position as to provide a 'safety barrier' to protect them from speeding motorists," (*id.*), precisely what the fire fighters did in *Cassell*. Also like Cassell, Parker and her co-workers were using equipment which had to be returned to the truck when the mission was finished — in *Cassell*, fire-fighting equipment, a pad, and a clipboard; here, a rake, a trowel, and shovels. None of those facts are present here. Since this court cannot say that an employee's having a vehicle's two-way radio on as required by an employer while working, leaving the door to the vehicle open in order to hear the radio, positioning the vehicle as a "safety barrier," and using equipment that had to be returned to the vehicle are less of a "use" of that vehicle than walking toward it to get a flashlight, and since the Supreme Court held that Parker was not covered, this court simply cannot say that Slade is covered. In sum, this court must hold that Slade "was not engaged in a transaction essential to the use of" the Maxima, just as the Supreme Court held that Parker was not engaged in a transaction essential to the use of the pickup truck. 250 Va. at 378. MIC's policy provides no underinsured coverage to Slade.[1]

---

[1] The court notes that plaintiff cites several other cases in support of her position. Because those cases, which are either Virginia circuit court cases or cases from other jurisdictions, cannot override the previously discussed Supreme Court cases, no purpose would be served by discussing them here.